GUARANTY TRUST CO. OF NEW YORK v. INTERNATIONAL STEAM PUMP CO.

(Circuit Court of Appeals, Second Circuit. February 16, 1916.)

No. 218.

1. CORPORATIONS ⬡⟹560(1)—RECEIVERS—MANAGEMENT OF PROPERTY—DUTY TO ASK FOR INSTRUCTIONS.

Where, after the appointment of receivers for a corporation in a creditors' suit, installments of interest became due on a mortgage, a failure to pay which entitled the trustee to declare the entire mortgage debt due and to foreclose, proper practice required the receivers to apply to the court for instructions with respect to the payment of such interest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2253, 2257, 2262; Dec. Dig. ⬡⟹560(1).]

2. CORPORATIONS ⬡⟹552—RECEIVERS—LEGALITY AND PROPRIETY OF APPOINTMENT—CONSENT OF DIRECTORS OF CORPORATION.

The consent of the directors of a corporation to the appointment of receivers in a creditors' suit *held*, on the evidence, to have been made in good faith, from a desire to keep the corporation a going concern at a time when the general financial situation was extremely uncertain, and not through any fraud or collusion with bondholders or one class of stockholders.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 2201; Dec. Dig. ⬡⟹552.]

3. CORPORATIONS ⬡⟹479—MORTGAGES—RIGHT OF TRUSTEE TO FORECLOSE—RECEIVERSHIP FOR CORPORATION MORTGAGOR.

Where there was default in the payment of interest and sinking fund due on a mortgage by a corporation which was in the hands of receivers, the trustee properly exercised its power to declare the mortgage debt due and bring a foreclosure suit.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1869, 1872–1874; Dec. Dig. ⬡⟹479.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Guaranty Trust Company of New York, trustee, against the International Steam Pump Company. Decree for complainant, from which Gilbert Collins, as foreign receiver, appeals. Affirmed.

The following is the opinion of Mayer, District Judge, confirming the report of the master:

---

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

It is unnecessary to add much to the literature of this proceeding, for the report of the special master, in whose conclusions I concur, is at once concise and comprehensive, and the hearing before him was conducted along the lines of thorough inquiry which I had hoped for, when brushing aside, for that purpose, all questions of laches and mere technique, I desired that the fullest opportunity should be opened to the objectors to prove the serious allegations of collusion and fraud, as well as the charge that the company was solvent on September 1, 1914, and thereafter, and able to pay the interest on the mortgage and the sinking fund installment which came due on that day.

While Receiver Collins is technically the party to this controversy who interposes an amended answer, the real attacking parties are certain stockholders and a committee of preferred stockholders who, among other things, insist that because of the unfairness of a proposed plan of reorganization the court should not make and enter a decree of foreclosure herein.

An earnest address is made by these stockholders, in effect, to the discretion of the court to prevent what they assert will be an unjust and unfair rearrangement of bond and stock holding interests under the new plan which is intended to be effective in due course if a sale under the decree of foreclosure takes place. I have said "in effect to the discretion of the court" advisedly, because courts are not empowered to make contracts for parties in interest, nor can courts adjudge or decree the terms upon which a mortgagee may allow to junior lienors, or others, participation in his mortgaged property when failure to pay the debt due him brings that property under the hammer.

It is rare that any reorganization is satisfactory to all concerned; for, in the nature of things, when there is not on hand enough to satisfy every obligation in full, some, and perhaps all, must suffer more or less; but, in the absence of fraud in the inception or a fraudulent scheme to which court proceedings are necessary incidents, the field in which the battle for respective adjustments must be fought out is beyond the court room, for the court can only ask whether, without the aid of fraud or unlawful means, the debt is really and justly due.

It is clear, therefore, that the court cannot directly or indirectly rewrite this reorganization agreement and I should not state something so obvious, were it not for the fact that the argument, so urgently pressed, comes down to that. The charges of fraud and collusion are not only not sustained, but are affirmatively disproved, as the record abundantly shows.

To have a real understanding of a situation, we must put ourselves back to the time when the event occurred. I well remember when the application for the appointment of receivers was made. The European War had gravely disturbed financial conditions, and as a consequence credit was tightened to the straining point. There was a large measure of forbearance and calm good sense, but financial institutions, of necessity, were reluctant to lend money in those earlier days of that trying period, for no man was wise enough to see far ahead; and, on August 26, 1914, and September 1, 1914, that any banking institution would lend money to the overcapitalized and overloaded International Steam Pump Company, doing a hesitant business, was a proposition so unlikely as not to suggest serious discussion. General business conditions, perhaps, were slightly better on December 2, 1914, the date when the trustee declared the principal due, but the condition of the company was no better for the practical purpose of relieving the default.

[1] I have no doubt that had the receivers applied to me for instructions, I would not have seen the way clear for the default to be relieved in view of the situation of the company and the then conditions of its business and of business at large. I regret that the receivers did not ask the court for instructions. Such a course might have averted the present controversy, and receivers are herewith informed that in all future cases they must apply for instructions; but there is no reason to believe that this omission was purposeful, for, in view of the petition for leave to issue receivers' certificates (Exhibit R) on or about September 18, 1914, they might naturally conclude that it would be an act of supererogation to ask what they should do in respect of the interest and the sinking fund installments in default when they had been authorized to raise a large fund because "without adequate capital

with which to carry on the business of defendant company so as to preserve and protect its property and assets."

In pointing out the course to be pursued by receivers hereafter, I am not to be understood as criticizing counsel for the receivers (upon whose advice, in such a matter, receivers are entitled to rely); for his labors have been marked by unceasing effort and a high sense and practice of devotion. The suggestion now made that the default may be cured at this time is highly impracticable, even if it were possible as a matter of law. The corporation has been declared dissolved and its charter forfeited by a decree of a court of competent jurisdiction. I know of no means to bring it to life. It cannot be that the Court of Chancery of New Jersey would vacate its own decree on a state of facts which cannot be changed, and in any event I cannot speculate on the ultimate result of further litigation along that line.

Other suggestions as to the sale of the plant and the borrowing by the receivers of money with which to pay the interest and sinking fund installments, are likewise impracticable. This court must keep faith with its own certificate holders and has always done so, and, after all, business is not an abstraction, but a real thing, and even if only $1,300,000, and not $10,200,-000, were required, there is only one way, in justice to this property, to produce it and that is to produce it. To theorize about it may be interesting but is not convincing.

To conclude: The trustee was fully within its rights, there is no suggestion that its conduct was in any way open to question, and there was no fraud or fraudulent collusion to which the bondholders were parties. There are several reasons, as the master has pointed out, why the plaintiff must prevail; but, in confirming his conclusions, I think it desirable to add that the record satisfies me that the directors acted in good faith when they concluded that a receivership was inevitable and that this course was determined upon, not to injure the company, nor to gain advantage for any particular class of security holders, but to save the business and plant as a going proposition.

I think I understand the point of view of the complaining preferred stockholders and their criticisms of the reorganization agreement, and it is but natural that they should endeavor to obtain what they may consider would be a just participation in the proposed reorganization; but, on examination of this extensive record, there is no escape from the conclusion that both the receivership and the foreclosure were justified on the facts as they existed on and from August 26th and up to December 2d.

Finally, I am of opinion that the court had jurisdiction in the suit in which the receivers were appointed, and unquestionably had jurisdiction in the foreclosure suit. I have examined the cases cited, and I find no case which authorizes the court to withhold its foreclosure decree where fraud, in some form, is not shown.

The case of Bogert v. Southern Pacific Company (D. C.) 226 Fed. 500, called to my attention since the argument, deals with a situation which, in my opinion, is entirely different from the case at bar, both on the facts and in respect of the principles involved. For the reasons outlined, the special master's report will be confirmed, and the decree will pass.

As the amended answer was interposed in good faith and the trial before the master will, in my opinion, be a benefit in the long run, because all the facts have thus become of record and the doubt which always exists in the absence of a full inquiry has been removed, costs (by which is meant disbursements) will not be imposed. If, however, an appeal is taken, then the objectors acting through Receiver Collins will be taking their chances as litigants on facts which they now know, and, in the event of an affirmance, costs of this trial will be taxed against them in this court.

Settle decree on two days' notice.

The following is the opinion of Special Master Gilbert in the court below:

This cause was originally referred to me by order of this court dated August 19, 1915, to hear and determine the issues of law and fact arising in said cause and to report: (1) The amount due on the first lien 5 per cent. 20-year sinking fund gold bonds of the International Steam Pump Company for

principal and interest; (2) the nature, extent, and character of the property mortgaged and pledged by the first mortgage and deed of trust and the mortgage supplemental thereto of the International Steam Pump Company; and (3) the nature, extent, and character of the property of said International Steam Pump Company not subject to said first mortgage and deed of trust and the mortgage supplemental thereto. Subsequently, and by order dated October 19, 1915, Gilbert Collins, receiver of the International Steam Pump Company appointed by the Chancery Court of New Jersey in an action to dissolve the corporation, was permitted to amend his answer in this cause and to file an amended answer in the form submitted upon the application, except that there was stricken from the said proposed answer any and all allegations with respect to the "Anti-Trust Act of July 2, 1890 (26 Stat. 209, c. 647) and any defense based upon the terms of said Act." The original pleadings required only the taking of proof of the formal allegations of the bill, and this proof had been taken and completed prior to the amendment of the answer by Receiver Collins.

The amended answer filed by Receiver Collins, however, presented two new issues, substantially as follows: (1) A defense that the default in the payment of interest and in the payment of the sinking fund installment required by the mortgage in suit, which interest and sinking fund installment became due September 1, 1914, was the result of collusion and fraud between the directors of the International Steam Pump Company and some of its stockholders and its bondholders and others; and (2) that the International Steam Pump Company was, on September 1, 1914, and thereafter, solvent and able to pay the interest on the mortgage and the sinking fund installment which came due on that day, by reason of which the defendant should be relieved of the default. Pursuant to the terms of the order of October 19, 1915, the taking of testimony before me on the special issues, presented by the amended answer of Receiver Collins began on October 19, 1915, and ended on November 1, 1915. On the hearing before me, I was attended by Messrs. Stetson, Jennings & Russell, solicitors for Guaranty Trust Company of New York, complainant (Mr. Wardwell and Mr. Sunderland, of counsel); by Messrs. Cravath & Henderson, solicitors for the complainants Conley and others in the action in this court in which receivers were appointed, and representing the bondholders' committee, of which Charles H. Sabin is chairman (Messrs. Paul D. Cravath and Douglas M. Moffat, of counsel); by Messrs. Alexander & Green, solicitors for the defendant International Steam Pump Company, and representing the stockholders' committee, of which Lewis L. Clarke is chairman (Mr. William W. Green, of counsel); by Leventtritt, Cook & Nathan, solicitors for the receivers appointed by this court (Mr. Edgar M. Leventritt, of counsel); by Mr. Merritt Lane, counsel for Gilbert Collins, the New Jersey receiver; also by Messrs. W. Bourke Cockran and McDougall Hawkes, associated with Mr. Merritt Lane.

As to the defense based upon the charge of collusion and fraud:

The International Steam Pump Company for some years prior to the year 1914 owned all of the stock of various corporations which are hereafter termed "companies wholly owned by the International Steam Pump Company." It also controlled by ownership of stock the corporations known as Henry R. Worthington, Blake & Knowles Steam Pump Works, and Holly Manufacturing Company. These companies are hereafter referred to as "companies controlled by the International Steam Pump Company." All of the companies, either wholly owned by the International Steam Pump Company or controlled by the International Steam Pump Company, were operated as separate and distinct companies under the control of the International Steam Pump Company.

It is quite clear, from the minutes of the various meetings of the directors of the International Steam Pump Company and from various reports and correspondence in evidence, that as early as the spring of the year 1913 the directors of the International Steam Pump Company had found the company to be handicapped by lack of sufficient working capital. At that time the combined companies owed the various banks and others on bills payable approximately $1,500,000. The directors also found that the operation of the company and of the companies controlled by it was cumbersome and expensive, because of the necessity of keeping up separate organizations for

subsidiary companies; and as early as the spring of the year 1913 the directors began to consider plans for additional permanent working capital and for a so-called unification of the various plants owned or controlled by the International Steam Pump Company.

There is no doubt in my mind, after hearing the testimony of the various witnesses and after reading the various exhibits submitted to me, that these efforts then begun by the directors were begun and conducted in good faith, having in mind solely the interests of the company, without regard to any special advantage in favor of bondholders or of the holders of common stock, or any disadvantage to the holders of preferred stock of the International Steam Pump Company. In the month of May, 1913, the directors found it necessary to borrow the sum of $300,000, and in order to borrow this money they induced Messrs. William Salomon & Company, J. B. Haggin, and M. Guggenheim Sons to guarantee the payment of the loan. In July, 1913, the directors arranged for a loan of $1,800,000 from various banks and trust companies, pursuant to the terms of the so-called collateral trust agreement in evidence, whereby the International Steam Pump Company and various of the companies wholly owned by it and the companies controlled by it pledged certain obligations and accounts receivable with the trustee for these various banks to secure this loan of $1,800,000, which according to the terms of the agreement became due on March 1, 1914. On March 2, 1914, this loan of $1,800,000 under the collateral trust agreement was reduced to the sum of $1,150,000, and a new loan was made by the various banks and trust companies, coming due according to its terms on October 2, 1914. This loan of $1,150,000 was likewise secured by bills and accounts receivable of the International Steam Pump Company and its subsidiary companies.

During the spring of the year 1914 the efforts of the directors to work out a plan for the permanent financing of the company continued. Many difficulties were presented in the consideration of these various plans for permanent financing, and apparently it was impossible for any one of the various plans which had been presented to be adopted. There were several reasons for this. One was the difficulty of obtaining unanimous consent of the bondholders to the creation of a lien prior to their mortgage. Another was the inability of the Benjamin Guggenheim estate, which owned more than half of the common stock, to contribute its share of the cash required. A discussion of these various plans to permanently finance the company and for unification of its various plants continued during the spring and early summer of the year 1914. In June or July, 1914, various of the directors of the International Steam Pump Company took up with various banks and trust companies a suggestion to pay off the loan of $1,150,000 as of July 31, 1914, and the placing of a new loan to run for at least six months. It was intended in this way to effect an extension of the existing loan which otherwise would become due on October 2, 1914. The banks were disinclined to make that arrangement at that time, and the directors concluded that the payment of this loan would be forced by the various banks on October 2, 1914, when it became due. The European War began on or about July 31, 1914, at or about which time the Stock Exchange in the city of New York closed. Business conditions generally were in a most chaotic state for some time after July 31, 1914. As it subsequently developed, banks did not generally call loans or force their payment when they became due in or about the month of October, 1914; but it is impossible to state that the directors of the International Steam Pump Company in July and August, 1914, were not in fact apprehensive of the calling of this loan when it should become due.

Various meetings of the directors and others interested in the company were held in the months of July and August, 1914, as a result of which the directors of the company concluded that it was necessary for the protection of all parties interested in the company to place the company in the hands of receivers to be appointed by this court. In order to give this court jurisdiction, William Salomon & Co. arranged for the purchase of a claim from Rogers-Brown of Buffalo, New York, which was assigned and transferred to Alexander J. Lindsay, who became one of the complainants in the suit for the appointment of receivers. Mr. McCulloh, representing J. B. Haggin, procured the complainant Conley, in whose name stood certain of the stock belonging to the Haggin family, and William Salomon & Co. also procured Mr. J. Horace

Harding as a bondholder to act as one of the complainants. It was understood by the directors that an action for the appointment of receivers would be brought by Messrs. Conley, Lindsay, and Harding, and that upon the commencement of the action the International Steam Pump Company should admit the allegations of the bill and consent to the appointment of receivers. It is quite clear, too, that the various attorneys acting in the matter appreciated that the appointment of receivers would be followed by the foreclosure of the mortgage securing the bonds, and that by reason of such foreclosure the control of the property would be in the hands of the bondholders.

The bonds secured by the mortgage sought to be foreclosed in this cause were owned by 1,631 different persons. On the 26th of August, 1914, the date of the appointment of the receivers by this court, the board of directors of the International Steam Pump Company consisted of 11 members. Of these directors, Messrs. Henry, Gannett, and Lane are referred to in the record as representing bondholders. Neither of these gentlemen are shown to have owned any bonds of the International Steam Pump Company. Mr. Henry was a member of the firm of William Salomon & Co., who had sold the bonds of the International Steam Pump Company in 1909; Mr. Gannett was a member of the firm of Parkinson & Burr, of Boston, which firm was interested with William Salomon & Co. in the sale of the bonds; and Mr. Lane was president of the Standard Trust Company of New York, which was the trustee of the mortgage in suit, and upon the merger of that company with the Guaranty Trust Company of New York became and still is a vice president of that company. The other members of the board had either been connected with some of the subsidiary concerns upon their being taken over by the International Steam Pump Company, or originally became members of the board at the invitation of the Guggenheim stock, with the exception of Mr. Moller, who was himself a stockholder, and who represented the Haggin interests, and Mr. Parlin, who was also a holder of a very substantial block of preferred stock. But one of the 1,631 owners of bonds is shown to be a member of the board of directors of International Steam Pump Company. So far as the record shows, Messrs. Henry, Gannett, and Lane were members of the board of directors without the knowledge of the 1,630 holders of bonds, and without any authority to represent them.

Whatever view may be taken of the action of the directors in consenting to the appointment of receivers on August 26, 1914, in contemplation of the default in the payment of interest and of the sinking fund installment, this action of the board of directors, so far as this record shows, was entirely without the knowledge, approval, consent, or co-operation of these 1,630 bondholders. If there was any bad faith on the part of the directors (and I do not find from the evidence that there was any), the bondholders were not parties to, nor had they any knowledge of, such bad faith; and there is nothing in the record which will justify a finding that the action taken by the directors was the result of any collusion or fraudulent device or scheme to which the bondholders were a party.

As to the ability of the International Steam Pump Company to pay the interest and sinking fund installment which came due on September 1, 1914:

In the presentation of the case to me, counsel discussed the condition of the company as of August 26, 1914, immediately prior to the appointment of the receivers, rather than its condition on September 1, 1914; and it will greatly simplify the situation if I discuss the situation as of August 26, 1914. The situation was substantially the same on August 26, 1914, as it would have been on September 1, 1914, had receivers not been appointed. The situation was substantially changed by the appointment of the receivers, because immediately upon the appointment of the receivers the various banks applied balances to the credit of International Steam Pump Company against its indebtedness to these banks; and we cannot very well discuss the ability of the International Steam Pump Company to pay interest and sinking fund installment on September 1st, because on that date the company was under injunction and its assets and property were in the possession of the receivers appointed by this court.

The amount required to pay this interest and sinking fund installment com-

ing due on September 1, 1914, was $483,697.50, and the contention of Receiver Collins is that it was possible for International Steam Pump Company, had it not gone into the hands of receivers, to have made these payments when they became due. On August 26, 1914, the cash situation of the International Steam Pump Company and its subsidiary companies was as follows:

International Steam Pump Company:

| | | |
|---|---:|---:|
| Moneys on hand in general account | $290,514 | 32 |
| Moneys on hand in special account | 1,131 | 93 |
| On deposit with Bankers' Trust Company under collateral trust agreement | 24,902 | 50 |
| Total cash resources of International Steam Pump Company, including moneys with Bankers' Trust Company covered by collateral trust agreement | $316,548 | 75 |

Companies wholly owned by International Steam Pump Company:

| | | |
|---|---:|---:|
| Moneys on hand in general account | $ 28,515 | 14 |
| On deposit with Bankers' Trust Company under collateral trust agreement | 32,868 | 89 |
| Total cash resources of companies wholly owned by International Steam Pump Company, including moneys with Bankers' Trust Company covered by collateral trust agreement | 61,384 | 03 |

Henry R. Worthington:

| | | |
|---|---:|---:|
| Moneys on hand in general account | $225,481 | 39 |
| On deposit with Bankers' Trust Company under collateral trust agreement | 130,092 | 89 |
| Total cash resources of Henry R. Worthington, including moneys with Bankers' Trust Company covered by collateral trust agreement | 355,574 | 28 |

Blake & Knowles Steam Pump Works:

| | | |
|---|---:|---:|
| Moneys on hand in general account | $ 7,570 | 42 |
| On deposit with Bankers' Trust Company under collateral trust agreement | 16,018 | 41 |
| Total cash resources of Blake & Knowles Steam Pump Works, including moneys with Bankers' Trust Company covered by collateral trust agreement | 23,588 | 83 |

Holly Manufacturing Company:

| | | |
|---|---:|---:|
| Moneys in special account (fire loss, pledged under Holly mortgage) | 67,268 | 27 |
| Making a total of cash resources of all the companies, as above stated, of | $824,364 | 16 |

It will be seen at once that the International Company as a separate organization did not have enough cash on hand to meet the payments coming due on September 1, 1914. It is also apparent that, if the International Company could possess itself of all of the cash of all the subsidiary companies, the payments could be met; and counsel for Receiver Collins insists that it was possible for International Steam Pump Company to have possessed itself of the cash of the various companies and thus meet the interest and sinking fund installment payments coming due September 1st. The theory on which counsel for Receiver Collins proceeds is that these various subsidiary companies were indebted to the International Steam Pump Company in large sums, and that the International Company could have called upon the subsidiary companies to liquidate these obligations, and, furthermore, that the International Company could have required the directors of Henry R. Worthington to declare a dividend, and thus transfer cash belonging to Henry R. Worthington to the International Company. Counsel for Receiver Collins also contends that there were accounts receivable in a large amount, which could

have been pledged or otherwise used to raise money, and that there were certain bonds which could have been used in reducing the amount of actual cash required and for the purpose of raising additional cash. It is necessary, therefore, to review generally the condition of the various companies, as of August 26, 1914.

We will first take up the suggestion that the companies might have been called on to pay indebtedness to the International Steam Pump Company and thus bring cash into that company. On August 26, 1914, Henry R. Worthington was indebted to International Steam Pump Company in the sum of $412,221.05. This sum represented the difference between a note of Henry R. Worthington to International Steam Pump Company in the sum of $537,500 and an indebtedness of International Steam Pump Company to Henry R. Worthington for the difference between $412,221.05 and $537,500. But this note of $537,500 of Henry R. Worthington to the International Steam Pump Company was pledged with the Bankers' Trust Company as trustee under the collateral trust agreement, so that this indebtedness of Henry R. Worthington to International Steam Pump Company was not available to the International Company.

On the same day Blake & Knowles Steam Pump Works was indebted to International Steam Pump Company in the sum of $972,965.53. Of this indebtedness $885,048.19 existed on June 30, 1909. Under the terms of the mortgage in suit there was pledged with Guaranty Trust Company as trustee, "five per cent. notes or other obligations when issued of said the Blake & Knowles Steam Pump Works, maturing in not more than twenty years from date, evidencing the entire indebtedness as of June 30, 1909, of said the Blake & Knowles Steam Pump Works to the Company." The 5 per cent. notes referred to in the mortgage were never issued, and the indebtedness of June 30, 1909, aggregating $885,048.19, remained an open account. Counsel for the complainant insists that, although it remained an open account, it was nevertheless pledged to the Guaranty Trust Company under the terms of the mortgage. Counsel for Receiver Collins contends, however, that this indebtedness was not affected by the mortgage, because the notes referred to had not in fact been issued. I am of opinion, however, that equity will deem this claim of $885,048.19 to be subject to the mortgage, leaving only $87,917.34 of open account which the International Steam Pump Company could have enforced against Blake & Knowles Steam Pump Works on August 26, 1914, and have used for the purpose of raising money.

This brings me to the accounts receivable. The situation with reference to accounts receivable owned by International Steam Pump Company and subsidiary companies on August 26, 1914, was as follows:

| | | |
|---|---:|---:|
| International Steam Pump Company and companies wholly owned by it: | | |
| Accounts receivable assigned to Bankers' Trust Company under collateral trust agreement | $ 621,773 43 | |
| Unassigned accounts receivable | | $1,046,940 97 |
| Henry R. Worthington: | | |
| Accounts receivable assigned to Bankers' Trust Company under collateral trust agreement | 319,974 02 | |
| Unassigned accounts receivable | | 447,857 02 |
| Blake & Knowles Steam Pump Works: | | |
| Accounts receivable assigned to Bankers' Trust Company under collateral trust agreement | 117,940 88 | |
| Unassigned accounts receivable | | 112,255 66 |
| Holly Manufacturing Company: | | |
| Unassigned accounts receivable | | 270,583 82 |
| Total assigned accounts covered by the collateral trust agreement | $1,059,688 33 | |
| Total unassigned accounts | | $1,877,557 47 |

For the purpose of the discussion we must at once exclude the accounts assigned to the Bankers' Trust Company and covered by the collateral trust

agreement. This leaves us with a very large amount of free unassigned accounts receivable in the possession of the International Steam Pump Company and its subsidiary concerns; and it is argued by counsel for Receiver Collins that these accounts receivable could have been used in raising money with which to meet the interest and sinking fund installment coming due on September 1st, 1914. No evidence, however, was introduced before me upon which I can find that it was possible to realize money on these unassigned accounts receivable. The proof is that most, if not all, of these unassigned accounts receivable had been tendered to the banks for the purpose of releasing cash on hand, which under the terms of the collateral trust agreement could be released upon the substitution of other accounts receivable of sufficient value; and I am unable to say that there were other means by which these accounts receivable could have been converted into cash.

Counsel for Receiver Collins further urges that the International Steam Pump Company bought and owned, presumably for sinking fund, bonds of the par value of $138,900, and that these bonds could have been sold to the sinking fund, which would have reduced the amount of cash actually necessary to pay the interest and sinking fund installment. But the answer to this suggestion is that at that time the market value of the bonds had largely depreciated and that it may not have been good business judgment to have used these' bonds at that time for that purpose.

Counsel for Receiver Collins also urges that the International Steam Pump Company was entitled to draw down some $240,000 of bonds for improvements, and that these bonds might have been sold and the money used toward paying the interest and sinking fund installment. But that was impracticable for the reason that it would have been necessary to list these bonds on the Stock Exchange, which would involve publicity regarding the company's financial extremities which the board of directors desired to avoid, and further the market price of the bonds had fallen to less than 50. I am unable to say that it was bad faith or bad judgment on the part of the directors in failing to draw down these bonds, assuming that the company was entitled to do so.

Counsel for Receiver Collins complains of the action of the International Company depositing with the Guaranty Trust Company as trustee the 20-year gold note of Henry R. Worthington for $178,000, and questions whether the mortgage covered this note. However that may be, the directors of the International Company understood that it did and the Guaranty Trust Company on August 26, 1914, actually held this note. It was therefore not available as free assets at that time.

Counsel for Receiver Collins also urges that it was within the power of the directors of the International Steam Pump Company to have caused the directors of Henry R. Worthington to declare a dividend on stock, which would have brought money into the treasury of the International Steam Pump Company. With reference to this suggestion and all other suggestions of pressing subsidiary companies for payment of indebtedness, it must be borne in mind that much of the valuable assets of the International Company consisted of stock holdings in subsidiary companies, and that the pressing of claims against subsidiary companies at that time might have seriously affected the financial condition of those companies, and in turn have seriously affected the value of the stock held by the International Company in the subsidiary companies.

All of the suggestions presented to me by counsel for Receiver Collins might have been properly presented in this court upon an application to direct the receivers appointed by this court to do such acts and things as might have realized sufficient cash to meet the interest and sinking fund installment coming due September 1, 1914, or for presentation by the receivers in an application to this court for instructions. The receivers did not apply to the court for instructions, nor did any party in interest apply to this court to direct the receivers in this regard. I must assume that the action of the directors in failing to do those things which counsel for Receiver Collins now claims might or could have been done was in good faith, because there is no evidence to the contrary; and I must likewise assume, because there is no evidence to the contrary, that the receivers acted in good faith in failing to do·

those things which Receiver Collins through his counsel now claims might or could have been done. The fact remains that the interest and sinking fund installment which came due on September 1, 1914, was not paid, and that the default continued for three months, and that by reason thereof the bondholders are entitled to foreclose the mortgage and deed of trust in suit.

As to the suggestion that the default may now be relieved against and the parties restored to the position in which they were on August 26, 1914:

On November 1, 1915, there was due on account of the bonds secured by the mortgage and deed of trust in suit and for sinking fund installments, $1,381,039.57. There is not now in the hands of the receivers sufficient moneys to pay this amount, and they could not pay it unless it is possible for them to realize moneys on accounts receivable or in some other form which this court might approve; but a very serious question is presented as to whether the parties can be restored to their original position. Counsel for Receiver Collins contends in the first place that the action in which the receivers were originally appointed by this court must be dismissed because of want of jurisdiction in the cause. This claim of want of jurisdiction is based upon two grounds: (1) That there was not such diverse citizenship as gave the court jurisdiction; and (2) that the action of the directors in consenting to the receivership was ultra vires. I am not able to agree with either of these contentions. I believe there was diverse citizenship, and I believe that the directors had the power to consent to the receivership. Counsel for Receiver Collins bases his claim of want of power in the directors to consent to the receivership upon section 63, page 1638, of the Compiled Statutes of New Jersey, which provides that within 10 days after a corporation shall become insolvent a meeting of stockholders shall be called and the affairs of the company laid before them. I see nothing in this statute which makes it impossible for the directors to consent to the appointment of receivers within the period of ten days. In fact Vice Chancellor Stevenson, in discussing the statute, says: "This duty imposed by this section is not often performed, and for this reason: It is generally more satisfactory when a corporation gets into the condition that this corporation is in to have a receiver appointed as quickly as possible."

But in attempting to restore the parties to their original positions, we are met with a still further difficulty. An action was brought in the Court of Chancery of New Jersey by one Ethel Elms to dissolve the corporation. In that action a decree of insolvency was entered on the 30th of November, 1914, by Chancellor E. R. Walker, advised by Vice Chancellor Eugene Stevenson. Receiver Gilbert Collins was appointed by order advised by Vice Chancellor Stevenson and signed by Chancellor E. R. Walker on January 8, 1915, and an order or decree dissolving the corporation was entered on the 28th day of April, 1915, advised by Vice Chancellor Eugene Stevenson and signed by Chancellor E. R. Walker. This last order or decree provides: "And the court doth by the power in it vested in pursuance of the statute therein made and provided, order, adjudge and decree that the said defendant corporation, the International Steam Pump Company, be and it hereby is dissolved and its charter declared forfeited and void."

I am therefore of opinion, and so advise, that the complainant in this cause is entitled to a decree of foreclosure and sale as prayed for by it.

Merritt Lane, of Jersey City, N. J. (W. Bourke Cockran, of New York City, of counsel), for appellant.

Stetson, Jennings & Russell, of New York City (Paul D. Cravath, William W. Green, Allen Wardwell, and Douglas M. Moffat, all of New York City, of counsel), for appellee.

Before COXE, WARD, and ROGERS, Circuit Judges.

PER CURIAM. [2, 3] We are satisfied that the directors of the International Steam Pump Company were honestly desirous to keep the corporation a going concern and that they consented to the receiv-

ership under the creditors' bill filed August 26, 1914, only because their efforts to do so had been unavailing. The situation of the company had been most precarious for some time past, and the financial situation of the country threatened to be unfavorable to debtors and to borrowers in the future. There is not a vestige of evidence that the Steam Pump Company or its directors colluded with the bondholders or with the common stockholders to destroy the interest of the preferred stockholders. The trustee of the mortgage acted exactly as it should have done in filing its bill September 2, 1914, and its supplemental bill of foreclosure December 8, 1914, for the protection of the bondholders. There is no reason for disturbing the decree of foreclosure or for interfering with the sale under it. The special master and the District Judge were of opinion that the charges of fraud made in the answer of the New Jersey receiver were wholly unsustained and we agree with them.

The decree is affirmed, with costs.