---

(156 App. Div. 182.)

PITTSBURG & S. R. CO. v. CENTRAL TRUST CO. OF NEW YORK.

(Supreme Court, Appellate Division, First Department. April 4, 1913.)

1. RAILROADS (§ 170*)—MORTGAGES—BONDS.

A mortgage by a railroad company of its main and branch lines to secure $12,000,000 of its bonds, which provides that $3,000,000 shall be used for the property covered by the mortgage, excluding a designated branch line, that $5,000,000 shall be reserved to defray the cost of constructing and equipping the designated branch, and that $4,000,000 shall be used for disbursements after a designated date in the construction of other lines and branches, and in the acquisition of other lines of railroad, and for other specified purposes, provides for the reimbursement to the company, by the certification and issue of bonds by the trustee of the mortgage, up to $5,000,000, for all expenses in constructing and equipping the designated branch, whether the work was done before or after the mortgage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 549–553; Dec. Dig. § 170.*]

2. CONTRACTS (§ 162*)—CONSTRUCTION—INCONSISTENT PROVISIONS.

Where two clauses of an agreement are repugnant and cannot stand together, the first will stand and the second be rejected.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 744; Dec. Dig. § 162.*]

3. RAILROADS (§ 170*)—MORTGAGES—BONDS—RIGHTS OF PARTIES.

A mortgage executed by a railroad company on its main and branch lines and other property to secure bonds, a specified part of which to be reserved for the cost of constructing and equipping a designated branch line, does not authorize the use of the designated amount for the payment of fees paid the state in connection with an increase of the company's stock, though, under the rules of the Interstate Commerce Commission and the State Railroad Commission, such items are charged to construction account; for such rules are mere regulations of bookkeeping methods.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 549–553; Dec. Dig. § 170.*]

4. RAILROADS (§ 170*)—CONSTRUCTION—INCONSISTENT PROVISIONS.

Where a railroad company executed a mortgage to secure bonds, a part of which were to be reserved for the cost of constructing and equipping a designated branch line, and increased its capital stock and sold its bonds as a part of its plans to create a fund with which to construct and equip the branch, the cost incurred in increasing the capital stock and preparing, issuing, and selling the bonds was not an expenditure for which it was entitled to have bonds certified and issued to it by the trustee in the mortgage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 549–553; Dec. Dig. § 170.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

5. RAILROADS (§ 170\*)—MORTGAGE—PROPERTY INCUMBERED.

Where a railroad company mortgaged its property, including stock in a corporation, to secure bonds for the acquisition of stock of other corporations, and deposited with the trustee the mortgaged stocks, the trustee and the bondholders could assume that the company owned the stock deposited, and could transfer it and the bonds could not be issued to pay for such stock; the clause allowing the use of bonds for the acquisition of stock of other corporations referring to stock acquired after the mortgage.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 549–553; Dec. Dig. § 170.\*]

6. RAILROADS (§ 170\*)—MORTGAGE—BONDS—RIGHTS OF PARTIES.

A mortgage executed by a railroad company to secure its bonds, which provides for a delivery by the trustee of $3,000,000 of bonds, for a reservation of $5,000,000 for the cost of constructing and equipping a branch line, and $4,000,000 for disbursement after a designated date in the construction of other lines, and for the acquisition of enumerated property, does not entitle the company to reimbursement for a discount paid by it in marketing bonds, the proceeds of which sale were applied to the construction of the designated branch line.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 549–553; Dec. Dig. § 170.\*]

Scott, J., dissenting in part.

Submission of controversy on an agreed statement of fact pursuant to Code Civ. Proc. § 1279, by the Pittsburg & Shawmut Railroad Company as plaintiff and the Central Trust Company of New York as defendant.    Judgment for plaintiff.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Frank Sullivan Smith, of New York City, for plaintiff.
Arthur H. Van Brunt, of New York City, for defendant.

DOWLING, J.    The questions litigated herein involve the right of the plaintiff to have authenticated and delivered to it by the defendant, as trustee under a first mortgage executed to it by plaintiff, certain bonds to be secured by said mortgage pursuant to certificates issued by plaintiff and furnished to defendant under the term of the mortgage, amounting, respectively, to (1) $446,638.61, (2) $433,192.10, (3) $216,416.11, and (4) $150,000, or an aggregate of $1,246,246.82.

By its first mortgage under date of December 1, 1909, plaintiff conveyed to defendant as trustee, to secure an issue of $12,000,000 of bonds, the following described property:

First. Its main line and six main branches, including the Freeport Branch, also all other lines owned by it at the time of the execution of the mortgage.    (It affirmatively appears from the granting clause of the mortgage that the main line was completely constructed, but there is no statement in that instrument as to the condition of the branches thereby conveyed.)

Second. All other property appurtenant to the above-described main line and branches, including rents, issues, and profits.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Third. All railways, extensions, appurtenances, terminal properties, and equipment, including bonds, stocks, and other properties and securities thereafter acquired.

Fourth. All additions, improvements, and betterments acquired or constructed in connection with the above-described lines.

Fifth. All leases and trackage contracts.

Sixth. Certain described bonds of the Pittsburg, Shawmut & Northern Railroad Company, aggregating upwards of $12,000,000.

Seventh. Thirty-six thousand seventy-two and sixty-seven hundredths shares of the Alleghany River Mining Company, fully paid, of the par value of $100.

Eighth. A contract by the Alleghany River Mining Company to deliver to the railroad company not less than $1,500,000 gross tons of bituminous coal in each year after January 1, 1912, until and including the year 1960; also a contract giving the railroad company an arbitrary of 10 cents per gross ton on all coal delivered to the Pittsburg, Shawmut & Northern Railroad Company.

Ninth. All property that might be thereafter conveyed to the trustees.

Article 2 of the mortgage provides for the authentication and delivery of bonds thereunder:

Section 1 authorized, upon the execution of the mortgage, the authentication and delivery by the trustee upon the written order of the railroad company of $3,000,000 face amount of said bonds.

Section 2 provides for the reservation of $5,000,000, face amount of bonds to be authenticated and delivered by the trustee "to reimburse the railroad company for the cost of constructing and equipping its line of railroad from Knoxdale to Freeport," and in that section the railroad company covenanted that such lines should be completely constructed and equipped as a first-class single-track road on or before January 1, 1912, and that such construction and equipment should be free from any lien or charge other than the said mortgage and without incurring other indebtedness than that which should theretofore be discharged by the use of the first-mortgage bonds or their proceeds.

Section 3 provides for the reservation of the remaining $4,000,000 of bonds to reimburse the railroad company for the cost of: (I) The construction, after the date of the mortgage, of any of the lines of railroad described in clause 1 of the granting clause, other than the Freeport Branch mentioned above, and of additional lines of railroad, extensions, and branches of the lines then subject to said indenture. (II) The acquisition after the date of said mortgage, by purchase or by merger, or consolidation of lines of railroad other than the Freeport Branch. (III) The acquisition of the capital stock and bonds or other indebtedness of other corporations, provided that not less than two-thirds of the entire outstanding capital stock of the corporation should be obtained and pledged thereunder. (IV) The construction of additional main tracks required in double tracking any of the lines. (V) The construction of tunnels and bridges and the reduction of grades or changes of lines. (VI) The purchase of roll-

ing stock and other equipment. (VII) The purchase and improvement of real estate to be used in connection with the lines, the construction, purchase, or acquisition of terminals, yards, shops, etc., useful or convenient in operation, and construction or purchase of other additions and improvements upon the lines of road then subject to said indenture.

Section 4 provides for the evidence upon which the trustee should act in authenticating and delivering the bonds reserved under sections 2 and 3. It is therein provided that before authenticating and delivering any of such reserve bonds the trustee should receive: (a) A copy of a resolution of the directors requesting the authenticating and delivery of a specified amount of bonds to reimburse the railroad company for expenditures made or indebtedness incurred for one or more of the purposes for which the bonds are reserved. (b) A certificate signed by certain officers, setting forth that stated expenditures were made after the date of the mortgage on account of one or more of the purposes for which bonds were reserved, and giving a detailed description of the subject-matter of such expenditures and their condition in respect to liens and other incumbrances, and making special provision for additional information in regard to securities pledged. (c) In certain cases a supplemental indenture accompanied by a certificate of general counsel that the same effectively subjected the property therein described to the lien of the mortgage; and in case of acquisition of securities the pledge thereof. (d) An opinion by general counsel of the company as to the liens upon the property, the cost of which was the subject-matter of the application and the necessity of conveyances or other instruments to subject the same to the lien of the mortgage.

The plaintiff having duly furnished the four certificates before referred to in two applications, the defendant has refused to authenticate and deliver the bonds desired, not objecting to the form or sufficiency of the certificate, but upon the ground that the expenditures for which reimbursement was asked were not within the scope of the sections of the mortgage authorizing the issue of reserve bonds.

The first certificate is for items aggregating $446,638.61 in payment of indebtedness represented by the plaintiff's notes given for indebtedness incurred by it prior to December 1, 1909, on account of the branch from Knoxdale to Freeport. Defendant claims that the $3,-000,000 of bonds first issued to plaintiff represented the then value of the property conveyed by the mortgage as of the date of December 1, 1909, and that, as the branch was conveyed by the terms of the mortgage, there is no consideration for the delivery of the bonds requested. Furthermore, defendant contends that as article 2, section 4 (b), of the mortgage, provides that the certificate shall set forth that stated expenditures were made after its date, the intention of the parties was plain that none of the reserve bonds should be used to pay for work done prior to that date. Additional objection is made to certain items aggregating $2,516.88, being fees paid to the state of Pennsylvania on the increase of plaintiff's capital stock, fees for the registration of the certificate of such increase and state taxes there-

on, on the ground that such payments do not come within the terms "construction" or "equipment."

At the meeting of the board of directors of the plaintiff company held on February 3, 1910, at which the issue of $12,000,000 in bonds was authorized, a resolution was adopted, of which the following was a part:

"Resolved, that the board of directors of this company, assembled in meeting duly held, declare it the purpose of this corporation to increase its indebtedness by the principal sum of twelve million ($12,000,000) dollars to accomplish and carry on and enlarge its business and purposes and particularly to provide funds for the construction and equipping of its lines of railroad from Knoxdale in the county of Jefferson, to Freeport, in the county of Armstrong, commonwealth of Pennsylvania, and for the construction of other lines and branches thereof; and for other corporate purposes."

The stockholders of the company, at a meeting held on the same day, ratified and approved the action of the board of directors by a resolution, one of the preambles of which was as follows:

"Whereas the Pittsburg & Shawmut Railroad Company deems it necessary to increase its indebtedness by the extent hereinafter specified to accomplish and carry on and enlarge its business and purposes, and particularly to provide funds for the construction and equipment of its lines of railroad, from Knoxdale, in Jefferson county, to Freeport, in Armstrong county, Pennsylvania, and for the construction of other branches and lines, and for such and other corporate purposes desires to borrow money."

The precise language used in the mortgage relative to the Freeport Branch, so far as now material, is as follows:

"Section 2. $5,000,000, face amount of the first mortgage bonds, shall be reserved to be executed by the railroad company, and to be authenticated and delivered by the trustee, to reimburse the railroad company for the cost of constructing and equipping its lines of railroad from Knoxdale to Freeport."

[1] It will be noted that in the list of properties conveyed the main line was stated to be completely constructed. There is no such statement as to the Freeport Branch. In article 2 there is a segregation of $5,000,000 in bonds for a specific purpose, viz., to repay the cost of constructing and equipping the Freeport Branch. The $12,000,000 of bonds were to be thus used: (1) $3,000,000, for the property conveyed, excluding the Freeport Branch; (2) $5,000,000 or so much thereof as might be required to defray the entire cost of constructing and equipping the Freeport Branch, which was to be defrayed entirely out of the bonds or their proceeds; (3) $4,000,000 for disbursements after December 1, 1909, in the construction of other lines or branches (other than the Freeport Branch) and in the acquisition of other lines of railroad and for the other purposes therein set forth.

Thus the plain and obvious intent of the parties would appear to have been that plaintiff should be reimbursed up to the limit of $5,000,000 for all its expenditures in the construction and equipment of the Freeport Branch, no matter whether the work was done before or after the mortgage was executed, and not merely for the cost of completing said work as still unfinished on said date. For its language expressly ex-

cepting the Freeport Branch, the mortgage gave no right to reimbursement for the cost of constructing the Freeport Branch under the $4,000,000 class, but only under the $5,000,000 class, as to which there is no limitation as to when the work was to be done to carry the right to reimbursement. Nor do the limitations contained in article 2, section 4 (b), restrict the plaintiff's rights to reimbursement to such expenditures as were made after December 1, 1909, for article 2, section 2, reserving the $5,000,000 of bonds to defray the cost of the Freeport Branch, as has been shown, contains no such restriction, and, being the major article of section 4 (b), is controlling on the point in issue. Section 4, prescribing the character of the proof to be furnished to entitle the mortgagor to receive bonds upon its certificate, was applicable by its terms to both sections 2 and 3, and to both the $5,000,000 and $4,000,000 blocks of bonds. It was therefore made so broad as to cover every element of proof required for either class. But the fact that it required proof that the disbursements for which reimbursements were requested were made after December 1, 1909 (which was required by the terms of the mortgage in order that bonds might be issued under the $4,000,000 class), did not read into section 2 (the major section) a similar requirement which was not provided by the mortgage itself. Section 4 (b) only operated as to certificates under the $5,000,000 class so far as to require so much of the proof therein set forth as applied to the mortgage provisions for that class.

[2] "It is trifling with the substance of things to say that two such antagonistic clauses can stand together, or that the latter is a mere modification of the other. If the agreement in the prior clause is antagonistic to the agreement in the latter clause, one must yield to the other. But it is a well-settled principle of construction that, if two clauses are repugnant and cannot stand together, the first will stand and the last will be rejected [citing Bean v. Ætna Life Ins. Co., 111 Tenn. 186, 78 S. W. 104, and other cases]. * * * We therefore reach the conclusion that the intrusion of an exception which did not operate to exclude from the contract something otherwise included has no important bearing upon the construction of the clause in which it is found." Employer's Liability Assurance Corporation v. Morrow, 143 Fed. 750, 74 C. C. A. 640.

We reach the conclusion, therefore, that plaintiff is entitled to the authentication and delivery to it of bonds to the amount of $444,-121.73, being the amounts disbursed for and about the actual construction of the Freeport Branch, pursuant to article 2, section 2, of the mortgage.

[3] The remaining item, aggregating $2,516.88, are for fees paid the state of Pennsylvania in connection with the increase of plaintiff's capital stock. These we do not think are within the purview of said section. They are not, strictly speaking, payments for either construction or equipment, which are physical results of moneys expended. Plaintiff claims that, because certain classifications made by the Interstate Commerce Commission, the Railroad Commission of Pennsylvania, and the Public Service Commission of New York permit such items to be charged to construction account, therefore it is

entitled to reimbursement for the same. But these are simply regulations having to do with the bookkeeping methods of corporations and with the accounts to which they should charge certain payments, and can have no bearing upon the interpretation to be placed upon the language used in a trust mortgage. We do not believe that these items are included within the term "construction" or "equipment," or that they can be said to have been intended to be so included.

[4] The second certificate is for $493,192.10, being expenditures made after December 1, 1901, for the following purposes: Bonus to state on increase of capital stock apportioned on mileage basis, cost of engraving first-mortgage bonds and stock certificates, cost of preparation and issue of mortgage and certificates of bonds of issue, cost and expenses of sale by the plaintiff of the $3,000,000 of bonds delivered to it under article 2, section 1, of the mortgage and state taxes paid on capital stock apportioned on a mileage basis. Plaintiff claims that, as the increase of its capital stock and the sale of its bonds were part of its plan to create a fund with which to construct and equip the Freeport Branch, it was entitled to reinbursement from the $5,-000,000 bond fund. The answer to this contention would seem to be that these expenditures were not made for construction and equipment, and that they are not within the language, scope, or intent of the mortgage, which contains no provision for any repayment of reorganization expenses, or the cost of increasing the issue of capital stock, or the costs to the plaintiff of marketing the bonds which it owns. What the mortage entitles plaintiff to receive under the article in question is the cost of construction and equipment only, and these items do not come within that classification. There is no appropriate provision for the reimbursement of the cost of financing the enterprise.

[5] The third certificate is for reimbursement of expenditures aggregating $216,416.11, made after December 1, 1909. Plaintiff claims to be entitled to bonds to this amount under article 2, section 3 (III), to reimburse it for an indebtedness of $216,026, with interest due by it to Thomas H. Hubbard & Co. on account of the purchase price of the 36,072.67 shares of stock in the Alleghany River Mining Company, transferred by plaintiff to defendant under the terms of the mortgage herein. All these shares of stock were specifically pledged and actually deposited with the trustee upon the execution and delivery of the mortgage. No statement appears therein that there was any lien thereon or any balance due of the purchase price thereof. When plaintiff so deposited the stock, the trustee and the bondholders had a right to assume and believe that the plaintiff owned the stock, and had the right to transfer it. It was part of the property for which the $3,000,000 in bonds were issued. The clause allowing reimbursement for the acquisition of the capital stock of other corporations clearly refers to stock acquired after the mortgage was made. This stock was not so acquired. It was owned by the plaintiff before the mortgage was made, and was transferred to the trustee as the property of plaintiff, without reservation or limitation. Good faith requires that plaintiff should be held to its plain representation that it

owned the stock and had the right to transfer it. If it was only transferring an equity in stock, it should have so stated in the mortgage.

[6] The fourth certificate is for $150,000, being expenditures made after December 1, 1909. Plaintiff claims to be entitled thereunder to reimbursement for a discount paid by it in marketing $1,000,000 of bonds received by it under the terms of the mortgage, the proceeds of which sale were applied to the Freeport Branch. There is no provision of the mortgage which can be interpreted to sustain such a claim, which, if correct, would result in plaintiff being entitled to receive the discount upon every bond received and marketed by it and thus prolong the operation indefinitely. Plaintiff agreed to accept reimbursement of its expenditures in its own bonds. What their value in the market may be, or what plaintiff may be able to realize upon them, is no concern of the defendant. It is clear that such expenditures are not collectible as part of the construction and equipment expense.

Judgment is therefore directed in favor of plaintiff that the defendant be ordered and decreed to authenticate and deliver to plaintiff bonds of the $5,000,000 class to the amount of $444,121.73 (and no more) under the provisions of article 2, section 2, of the mortgage made by plaintiff to defendant, without costs to either party.

INGRAHAM, P. J., and LAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. (dissenting in part). I entirely concur in the construction given by Mr. Justice DOWLING to the trust mortgage, but I think that the defendant should be directed to issue bonds to a somewhat greater extent than he advises.

With reference to the first certificate aggregating $446,628.61, he upholds the defendant's objection to the issuance of bonds for fees paid to the state of Pennsylvania on the increase of capital stock, fees for the registration of the certificates of such increase, and state taxes thereon, the ground of the objection being that such payments do not come within the terms "construction" or "equipment." As to each item the statement in the certificate is that it is "apportioned on mileage basis to that part of R. R. Co.'s line of road between Knoxdale, Pa., and Freeport, Pa.," by which statement I understand that it is proposed to charge against the funds provided for the construction of the Knoxdale and Freeport Branch, not all, but only its proportionate part of the aggregate bonus paid to the state on the increase of capital stock, and of the aggregate state taxes paid upon the same.

It seems to me that under the rules now generally recognized in estimating the cost of construction of railroads and like enterprises all the expenses necessarily incurred in creating what is known as the "going value," or, in other words, whatever is necessary to be expended in putting the enterprise into a position to commence operations is properly to be considered as a part of its construction cost, and that the fees and taxes necessarily paid to the state as a preliminary condition to commencing operations should be so considered. Where, as in the present case, different sources are provided from which funds are to be procured for constructing separate parts of

the same system, each part should be charged, as for a construction expense, with its due proportion of such fees and taxes. For the same reason I think that the defendant should be directed to issue bonds for the following items comprised in the second certificate, viz., proportionate bonus paid to the state after December 1, 1909, local taxes paid during construction, and proportionate amount of taxes paid after December 1, 1909, on the increase of capital stock. These items aggregate $44,196.08.

In all other respects I concur in the conclusion reached by Mr. Justice DOWLING.