AMERICAN S. S. CO. v. WICKWIRE SPEN-CER STEEL CO.

GUARANTY TRUST CO. OF NEW YORK v. WICKWIRE SPENCER STEEL CO. et al.

Nos. 1208–F, 1320–G.

District Court, W. D. New York.
Nos. 2870, 2978–E.

District Court, D. Massachusetts.
Nos. 44–165, E. 45–253.

District Court, S. D. New York.
Aug. 4, 1930.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (William C. Cannon and William R. Carlisle, both of New York City, of counsel), for Guaranty Trust Co. of New York.

Rushmore, Bisbee & Stern, of New York City (Bertram Shipman and Elliott W. Eaves, Jr., both of New York City, of counsel), for Chase Nat. Bank of City of New York.

Dudley, Stowe & Sawyer, of Buffalo, N. Y. (Joseph G. Dudley and Walter C. Lindsay, both of Buffalo, N. Y., of counsel), for receivers of Wickwire Spencer Steel Co.

Larkin, Rathbone & Perry, of New York City (Henry V. Poor and Henry E. Kelley, both of New York City, of counsel), for reorganization committee.

P. Randolph Harris, of New York City, for American S. S. Co.

Joseph & Zeamans, of New York City (Edmund G. Joseph and Harold Zeamans, both of New York City, of counsel), for stockholders' committee.

Kenefick, Cooke, Mitchell & Bass, of Buffalo, N. Y. (Thomas R. Wheeler, of Buffalo, N. Y., and Jerome N. Frank, of New York City, of counsel), for B noteholders.

HAZEL, District Judge.

On October 21, 1927, a suit was brought in this court by the American Steamship Company, a citizen of this state, against the Wickwire Spencer Steel Company, a citizen of the state of Delaware, engaged in the manufacture of a special form of steel wire and other wire products. The creditors' bill alleged that defendant was indebted to plaintiff in an amount due and owing, exceeding $4,000; that defendant was largely indebted to other parties who were insisting on payment of their claims; that there existed danger that creditors would bring suits resulting in attachments and execution levies which, considering defendant's maturing obligations, threatened the continuance of its business enterprises; also that defendant's indebtedness amounted to $22,000,000, while its assets, according to its books, were more than $29,000,000; that it had no ready money wherewith to meet its current obligations, was unable to pay the rent due on the Goddard plant

leased by it at Worcester, Mass., amounting to $89,237.50, and furthermore was unable to pay its installments of interest due on prior lien bonds amounting to $379,960. At the same time defendant filed its answer, admitting the essential allegations of the bill and assenting to the appointment of receivers. Edward C. Bowers, who was familiar with the affairs of the defendant company, and Charles L. Feldman, a lawyer of this city, were thereupon appointed receivers, and subsequently qualified as such. Similar proceedings in aid of the receivership were instituted in other jurisdictions where plants and properties were located, viz., in the district of Massachusetts; Northern district of Illinois, Eastern division; Northern district of California; Eastern, Northern, and Western districts of Oklahoma; Western district of Texas; and Southern district of New York, and the receivership extended thereto, and the business of the defendant in the various jurisdictions has continued under the supervision of the receivers. On May 29, 1928, seven months after the receivers were appointed, the Guaranty Trust Company of New York, as trustee, filed its original bill, and later a supplementary bill, alleging default in additional installments of interest and default of the principal, in this district for foreclosure of a first trust mortgage dated January 1, 1920, on the various properties of defendant, to secure an issue of bonds amounting to $12,679,000, averring defaults made in installment payments of interest to November 1, 1926, and May 1, 1927, respectively. The Chase National Bank of New York also brought suit to foreclose the mortgage covering the prior lien mortgage in this district, executed as security to bondholders, against defendant's real property and properties specified in said mortgage for failure to pay unpaid installment interest on bonds pledged to it. These actions were, on motion, consolidated with the pending action for conservation wherein receivers were appointed, and the receivers continued in the consolidated actions. Ancillary bills were filed in other jurisdictions and the receivership extended thereto. Concededly the defendant company was solvent when the mortgages were executed and delivered. In the foreclosure suits the receivers filed answers admitting default in payments of interest on the trust mortgages; denied the validity of the mortgage liens relating to certain properties included in the mortgages, and submitted any question of priority of mortgage liens to the court for determination. The manifest purpose of the action was to conserve the assets, and the consolidation of the foreclosure action was in the spirit of effecting reorganization. Subsequently a stockholders' committee and a committee under the protective agreement of class B noteholders, duly organized, were permitted to intervene, and answers were separately filed by them broadly challenging the validity of the trust mortgages due to failure of consideration for the issuance of bonds under the first mortgage, collusion, fraud, and conspiracy on the part of officers and directors of the defendant and voting trustees of the common stock of the defendant and holders of class A notes in permitting default in payment of installment interest when its quick assets were available to pay the unpaid interest, and collusion in bringing about the appointment of receivers with the combined object of wiping out the stockholders and B noteholders and purchasing defendant's properties under a fictitious plan of reorganization by which special benefits were to be derived to the exclusion of the intervening class B noteholders and stockholders. Thereafter in July, 1929, the organized bondholders' committee and class A noteholders, who had subjected their security to the proposed plan of reorganization of the defendant, were also allowed to intervene and interpose answers.

On July 8, 1929, the special master was appointed herein to hear, determine, and report the issues raised by the pleadings. The parties have been fully heard. A great amount of testimony has been taken and the special master has filed an exhaustive report wherein he at length stated the facts and law upon which were based his conclusions that the mortgages were valid and that no fraud or unlawful conspiracy existed.

The intervening stockholders' committee and the Guaranty Trust Company of New York have filed exceptions to his report. The exceptions of the stockholders' committee in the main attack the findings relating to defendant's insufficiency of funds to meet maturing obligations; to the findings that the receivership action was not collusively brought; that it was necessary for defendant's officers and directors to rearrange the capital structure under which the company operated; that failure so to do would have endangered the successful continuance of the business; to his findings relating to the average profits of defendant for the years 1925–1929, inclusive; that the trust mortgages and indentures were valid and in conformity with law; to his finding that defendant Wickwire Company is, and has been since October,

1927, insolvent, requiring reorganization of its capital structure; and to the amount found to be due on said mortgages. The exception of the Guaranty Trust Company relates to the finding that 20,000 shares of the capital stock of the American Wire Fabric Corporation, subsidiary of the defendant, are not subject to the liens of the first mortgage. Such exception, however, is overruled. It was not seriously pressed at the hearing. No exceptions have been submitted by the class B noteholders, for concededly, after the hearing and before the report was filed, their claims and differences were adjusted with the reorganization committee, and they now join in asking confirmation of the report. The evidence in detail is so fully and accurately set forth in the report of the special master, wherein he traces the early history of the defendant company, its acquirements of other companies and plants in various localities, its financial difficulties, its capital stock sales, its need for expansion to compete with others engaged in like businesses, its expenditures for improvements and new equipment, its bonded indebtednesses, its mortgages and securities, that a summary reference only to salient features will be made herein.

In analyzing the evidence it seems to me that we are principally concerned with facts as distinguished from suspicions and theories and asserted wrongful acts in the management of the corporation in concert with the trust mortgagees and voters' trust committee. The fair value of the collective properties, the special master found, does not exceed $18,000,000, while on August 31, 1929, the trust mortgage liens, bonds, class A and class B notes and interest thereon, together with unsecured indebtednesses of the consolidated companies and its receivers in continuing the business, far exceeded the value of the collective properties, totaling $22,103,325.03, divided as follows:

| | | |
|---|---:|---:|
| First Mortgage Bonds.... | $ 1,823,000 00 | |
| Prior Lien Bonds.......... | 10,856,000 00 | |
| | $12,679,000 00 | |
| Accrued interest thereon.. | 2,199,367 11 | $14,878,367 11 |
| Class A Notes............. | 2,515,000 00 | |
| Accrued interest thereon.. | 381,441 66 | 2,896,441 66 |
| Class B Notes............. | 3,639,340 00 | |
| Accrued interest thereon.. | 473,114 20 | 4,112,454 20 |
| Unsecured trade creditors | 194,650 51 | |
| Accrued interest thereon.. | 21,411 55 | 216,062 06 |
| | | $22,103,325 03 |

These obligations and indebtednesses amount to $4,000,000 more than the maximum value of the property, and, assuming the finding of the special master to be correct, no equity remains for the stockholders, for it has frequently been decided that, where the value of the property incumbered is appreciably less than its fair value, a right exists of foreclosure of the first mortgage given to secure the bonds. In such case it is generally held that the amount realized on sale is first applied to its payment, assuming its validity; while the surplus is to be applied on junior liens and indebtednesses, the remaining amount, if any, to the stockholders.

The financial affairs of the Wickwire Spencer Steel Corporation, now the Wickwire Spencer Steel Company, became strained a few years after it acquired the capital stock of the American Wire Fabrics Corporation which was in September, 1922, and for which it paid in cash $777,500 and obligated itself by secured notes for the balance of the purchase price amounting to $1,775,000. Its sales for a few years increased and gross profits were realized, but its banking credit nevertheless became uncertain, and at times there was insufficient money to meet its current needs. In 1924 its future was considered precarious by its directors and its bankers. Its sustained losses impaired its liability. It had difficulty in obtaining further loans from the banks, and receivership was contemplated. A plan of reorganization, however, was adopted with the approval of the stockholders. Its name was changed to the Wickwire Spencer Steel Company, and the old corporation conveyed all its properties to the new company which assumed all the former's liabilities. The common stock was held by voting trustees, for a period of years, with the power of issuing voting trust certificates to common stockholders of the present company, and additional capital was raised amounting to $2,515,000. The specific manner in which this capital was acquired is set forth in the report. At the time the said capital was obtained, the fixed liabilities from first mortgage bonds, prior lien bonds, secured notes, class A and class B notes amounted to upwards of $21,000,000. Although the first mortgage bonds amount to $12,679,000, $10,856,000 thereof was pledged with the trustee of the prior lien mortgage as security for the prior lien bonds. In view of the conditions, the plan of reorganization was deemed reasonable by the special master, and indeed was consummated, he said, to avoid insolvency and receivership. The current assets at this time amounted to $8,505,413.78, deferred assets $23,504,029.64, carrying liabilities $1,088,376.78, and funded lia-

bilities $30,921,066.64. There were losses in the ensuing years, and the board of directors in June, 1927, earnestly considered reorganization of the company's capital structure, but nothing came of it. On October 1, 1927, the defendant company owed $89,237.50 on the Goddard lease, and interest on the prior lien bonds fell due, amounting to $379,000. Its cash approximated $158,344.93, while accounts payable amounted to $974,369.94. It could not see its way to paying the interest on the prior lien bonds and other debts, and this action was then brought. During its pendency various plans of reorganization have been proposed; and, following receivership, the operations hopefully improved, but in October, 1929, there was a marked decrease in demands for steel wire and generally wire articles—a decrease in October from $1,643,626.96 to $1,362,519.95, and in November a decrease of $281,107.01. The increased earnings under the receivers' operation of the plants, including the American Wire Fabric plant, the special master regarded as no assurance that gains would continue; but he said that with the making of proper capital expenditures, as pointed out by him, for the next three years, and continuance of good management, together with adequate working capital, a higher average net income ought to be realized than the net income shown for the preceding five years. The net sales for the years 1925 to 1929 are embodied in the report. The net profits for those years, after deducting depreciation and sundry charges, excepting interest on the first and prior lien bonds and on class A and class B notes, and generally deferred liabilities, aggregated for those years $4,399,975.77, while the average net profits during those years, before deduction of fixed charges, was $879,995.15. The surplus account decreased from December 31, 1925, to September 30, 1929, from $8,064,122.09 to $5,282,299.83; and the total indebtedness on August 31, 1929, of the Wickwire Company and the receivers, amounted to $26,329,815.64 (?).

The special master found that the claim advanced by the stockholders' committee that the trust bondholders, noteholders, bankers, and attorneys conspired to acquire the properties in question, and wrongfully designed to exclude the B noteholders and stockholders from any participation in the proposed reorganization, was not substantiated by the proofs, and, further, that there is no defense to the foreclosure of the trust mortgages; that in fact the Wickwire Company is insolvent, and that there is impelling necessity of reorganizing its capital structure; also

that, after deduction of underlying obligations and indebtednesses of the receivers, the value of the various real and personal properties of the Wickwire Company, including its goodwill and ownership of the stock in the American Wire Fabrics Corporation and the Goddard Works and plant as of August 31, 1929, there remains available for distribution to the mortgagees for bondholders and noteholders and creditors the sum of $18,000,000, of which $8,436,046.12 constituted quick assets which were not subject to the liens of the mortgages, leaving $9,564,539 subject thereto; and that the real estate, plants, and machinery are valued at $8,175,073.80, and investments in stocks in other corporations are valued at $1,384,466.08. What has been outlined conveys a conception, I think, of the facts leading to the receivership, and for more detailed data recourse may be had to the report.

The motives of the officers and directors of the Wickwire Company in conjunction with the trustee of bondholders and voting trust committee are severely attacked, and on various grounds reinstatement of the trust mortgages under foreclosure is contended. These grounds have been carefully considered, and, in giving them consideration, the background of the Wickwire Company's business activities, its financial struggles from 1920, and its obvious inability to meet either its current or future obligations, cannot in fairness be ignored. Its debts, and the evident unwillingness of banks to extend further credit, presented insurmountable difficulties to a continuance of the industry without the intervention of a court of equity. The vast business enterprises conducted in different states obviously required protection. Its obligations due and shortly to become due aggregated $974,369.94. It had insufficient money to make payment of the semiannual interest on the Goddard lease already mentioned. It was unable to use its cash on hand for that purpose, for, if it had, as the evidence shows, no money would have been available to continue operations—not to mention large amounts falling due, including interest on mortgages, and aggregating nearly $1,500,000. The authorization of receiver's certificates would not have been helpful, since it was doubtful whether they would have been taken subject to prior existing incumbrances.

Criticism is made of the manner in which the receivers, at the instance of the directors, were appointed. It is true that a receiver is an officer of the court, and as Chief Jus-

tice Taft said in Harkin v. Brundage, 276 U. S. 38, 48 S. Ct. 268, 275, 72 L. Ed. 457, they "should be as free from 'friendliness' to a party as should the court itself"; but I agree with the finding that no friendly condition eventuated in view of the financial stress of the Wickwire Company. The manner in which the firm of attorneys for the Wickwire Company were engaged to file an answer admitting the allegations of the bill and consenting to the appointment of receivers, and the solicitation of counsel for plaintiff, a contract creditor, to bring this action on a complaint prepared by counsel representing the reorganization committee, are also criticized. Such methods cannot be approved, since they tend to lend color to claims of collusion and concert of action. But these actions, as an examination of the record discloses, were not in aid of the furtherance of a preconceived conspiracy or scheme to wipe out the interest of the stockholders, any one of whom could have become a party to the action by intervention and objected to the receivership. None did so. The stockholders were silent and evidently acquiesced in the purpose of conservation until after foreclosure was instituted, and reorganization, in view of the default in payment of interest and principal coming due, apparently was the only practical thing to do. The special master did not regard those acts as elements of conspiracy or wrongdoing. The action being one to conserve the properties of an important industry with a view of reorganizing its affairs, it seemed reasonable, he found, to accept the suggestion of parties in interest that Mr. Bowers, president of the Wickwire Company, a person who was fully acquainted with the operations and financial affairs of the Wickwire Company and in whom the parties appearing before the court seemingly had confidence, should be appointed one of the receivers. Neither his interests nor the interests of his associate receiver, a disinterested lawyer of this city who, until recently, gave nearly all his time following his appointment to the discharge of his duties, were antagonistic to any interested parties. The firm of attorneys for the receivers were appointed on suggestion of the receivers appearing in their petition to the court, showing the necessity of advice of counsel in the administration of their trust in protecting the interests of the receivership estate in this district and in other jurisdictions wherein ancillary actions were brought. Such attorneys were appointed on a showing that none of its members had any interest adverse to any of the parties to the action.

Under the principle announced in Pusey & Jones Co. v. Hansen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763, and In re Metropolitan Ry. Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403, the answer interposed by defendant admitting the allegations of the bill and consenting to the appointment of receivers constituted a waiver of the claim now made that plaintiff was not a judgment creditor. The failure of a stockholder or the stockholders' committee to seasonably press the objections that the court was without jurisdiction to entertain the bill, and its denial that there was insufficient funds to meet current or future obligations, must, I think, be considered as waived. For, as said in Brown v. Lake Superior Iron Co., 134 U. S. 530, 10 S. Ct. 604, 33 L. Ed. 1021: "Good faith and early assertion of rights are as essential on the part of a defendant in equity as they are on the part of the complainant."

It is next urged that the answer of the receivers to the foreclosure proceedings did not aver defenses which were subsequently interposed by the stockholders' committee, and that the personal properties illegally included could have been pledged to secure funds to pay installments of interest and other pressing indebtednesses. The answer of the receivers in the foreclosure suits raised a general issue as to the assets covered by the trust mortgages and indentures, whereas the answer of the interveners specifically challenged the validity of the mortgages and indentures as to so-called quick assets, including stock in the American Wire Fabrics Corporation and other effects. Counsel for the interveners are no doubt entitled to commendation for their earnest and capable services in this particular, but I fail to see how the receivers could have pledged such properties to pay the accrued debts in view of the asserted inclusion in the lien documents of all properties and assets, and perhaps the maintenance by the trustees that various classes of assets were subject to the collateral trust indenture and to the lien of the first mortgage. It was an open question for judicial determination, and the special master decided it adversely to the contention of the trustees:

It is pointed out, as bearing upon the bad faith of the receivers, that they failed to ask the court for instructions before allowing a default under the security mortgages and indentures. No doubt it would have been better practice to do so, but in all probability the financial conditions as they then were understood to be, together with the terms of the

mortgages, would have barred borrowing money in the large amount needed, and probably the foreclosure could not have been averted without payment of the interest then due. There is no evidence that the receivers omitted applying for instructions because of any ulterior motives. In Guaranty Trust Co. v. International Steam Pump Co. (C. C. A.) 231 F. 594, 595 (affirmed 231 F. 603), Judge Mayer had before him a similar situation, but, since the capital in that case was inadequate, as here, for carrying on the business, he did not regard the omission as having been made designedly or with injurious effect.

It is represented that, because the receivers, soon after their appointment, without instructions from the court, notified the Guaranty Trust Company, transfer agent of the common stock voting trust certificates of the Wickwire Company, that they would no longer be responsible for the entailed transferring expenses, amounting to $6,000 per year, the stock was stricken from the list of the New York Stock Exchange, and in consequence there were no sales. Such action, however, it is fair to assume, was in good faith and in the belief that not many shares would be sold and no benefit accrue to the Wickwire Company. Indeed, there is evidence tending to show that, for the year prior to the receivership, few shares were sold, and only at a price of $1.87½ per share. In the circumstances I think cutting off the transfer expense was justified. In any event, remissness in this particular cannot be considered as just reason for deterring entry of a decree of foreclosure and sale, or as bearing upon the alleged conspiracy or collusive understanding. It is suggested that the stockholders' committee is prepared to pay an assessment of $6,000,000 and take in exchange preferred stock at 6 per cent. interest without sinking fund requirements, if given a fair right of participation in the reorganization, but this question will be reserved until the proposed plan of reorganization regularly comes before the court. I think the master rightly rejected the chart as evidence (Stockholders' Exhibit 72 for identification) offered with a view of inferentially showing mismanagement by the officials of the defendant company by making comparison of earnings and expenses with other steel companies, for such testimony could not be considered relevant as against the trustees of the mortgages. Certainly, without proof that the product of other industries was of the same class as that of the Wickwire Company, it would have no bearing whatever upon the issue of conspiracy and collusion. Although it was the duty of the receivers to conserve the assets of defendant company, and as representatives of the stockholders to preserve any interest they might have, yet, in view of the lack of funds to continue operations to enable competing with its competitors, and especially wherewith to avoid foreclosure and suits to recover on current debts and obligations, a condition was presented which the receivers, as I believe, were wholly unable to overcome. The fact that the Wickwire Company earned its fixed charges, plus depreciation charges for a year and a few months immediately following the receivership, was no test or measure of continuance. Indeed, the ensuing decrease of its earnings supports the view that borrowing on the strength of the brief profitable period would have been a shadowy effort to ward off the inevitable.

The next point urged (which, perhaps, is the most important) is that the Guaranty Trust Mortgage, dated January 1, 1920, and later the prior lien mortgage to the Chase National Bank, pledging a larger part of the bonds to the latter, are void ab initio in so far as the first mortgage covers the chattels and real estate of the mortgagor located in this state alone, and that the prior lien mortgage is also entirely void, since it was designed to preserve the void lien of the bonds secured by the former. This attack upon the mortgage liens was carefully considered by the special master, and the wealth of authorities cited in reliance on the claims of invalidity were analyzed and distinguished by him in his treatment of the assertions that there was actual or constructive fraud in making and delivering the first trust mortgage in question; and he reached the conclusion on the fact that there was no intent to defraud or to include in the liens the personal properties excluded by him. He limited the lien of the mortgages to property specifically enumerated and described, excluding inventory of materials, the so-called quick assets, the stock in trade, finished and unfinished products, cash on hand, and accounts receivable. He has dwelt upon the facts and law so thoroughly that I conceive it to be entirely unnecessary to at length restate his findings with relation to the particular matter under discussion, except as to certain phases and differences of opinion arising at the hearing before me regarding the decision by the Circuit Court of Appeals in Brown v. Leo (C. C. A.) 12 F.(2d) 350 and Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991.

■ The questions submitted are not wholly free from difficulty. In considering the asserted fraud and consequent invalidity of the instruments in issue, this court cannot close its eyes to the fact that, in consequence of the mortgage lien of 1920, a large number of bonds were in good faith purchased, the purchasers implicitly relying on the validity of the securities, the solvency of the mortgagor, and generally the bona fides of its officers and directors and trust mortgagee—a condition that is now attacked, not by unsecured creditors, but by a committee of common stockholders who were parties to the making and delivery of the incumbrance. Assuming for the moment that the common stockholders have the legal or equitable right to question the validity of the bondholders' securities on their own behalf or on behalf of the B note-holding creditors, who, after the hearing, withdrew as objectors, the asserted invalidity, based on fraud, must certainly clearly appear from the primary clauses of the trust mortgage, and the facts and circumstances; for any doubt in relation thereto should be resolved in favor of validity to the end that the securities of the bondholders be upheld. Numerous adjudications in this state uphold the view that interpretation of security documents under seal is ascertained by a fair and reasonable construction of their terms and provisions, while phrases unconnected with the granting or primary clauses are not to be separated from the context and scrutinized by themselves in disregard of the document as a whole. Indeed, minor, subordinate or supplementary provisions at variance with the granting provisions are not permitted to destroy the security. Cincinnati Gas & Elec. Co. v. N. Y. Trust Co., 215 App. Div. 122, 213 N. Y. S. 314; Lisman v. Michigan Peninsular Car Co., 50 App. Div. 311, 63 N. Y. S. 999. This principle also finds support in Harnickell v. Omaha Water Co., 146 App. Div. 693, at page 701, 131 N. Y. S. 489 (affirmed 208 N. Y. 320, 101 N. E. 1104). And see Cook on Corporations, vol. V, p. 3849; Thompson on Corporations, vol. IV, p. 270. The first mortgage contains a provision relating to all other property now owned or at any time thereafter acquired; and, also, in a separate paragraph, all inventories of materials in process of manufacture, bills and accounts receivable, and cash on hand and on deposit in bank. In Massachusetts inclusions of quick assets concededly does not avoid a mortgage ab initio in the absence of proof to support an intention to defraud creditors. It is doubtful whether Brown v. Leo goes so far as to imply that stockholders of a corporation, under the circumstances evidenced in the instant case, can raise such an issue of invalidity. There the court held that a mortgage covering both real estate and salable merchandise was fraudulent and void as to creditors, where it was agreed that the mortgagor should remain in possession and sell the merchandise in the ordinary course of business and use the proceeds for his own needs without accounting to the mortgagee. Such an arrangement, in this state, was a distinct fraud upon the creditors of the bankrupt regardless of the common-law rule, Judge Learned Hand wrote, for continued possession by a mortgagor as ostensible owner.

■ It is pointed out that the Wickwire Spencer Steel Corporation, which executed the first lien mortgage, did not, by any of the clauses embodied in the instrument, confer the right to possession or use upon the mortgagee. No right was given the mortgagee to deal in any shifting chattels, or in any of the enumerated materials or supplies for manufacture. The granting clause describes with care the property designed to be covered by the lien. The specific parcels of real estate included in the mortgage are located in this state and in the state of Massachusetts. The included fixtures, machinery, and equipment, appurtenances of the plants, furniture and other specific chattels, patents and licenses, leases, stock in various companies, mining rights, rents, and profits, etc., are also separately classified. Following the enumerations there is an omnibus provision, relating to all other property, real, personal, or mixed, now owned or acquired. Stock in trade, products finished or unfinished, are not mentioned in the granting clause; and, indeed, the trustee made no claim thereto and conceded that such articles and quick assets were not intended to be mortgaged and are not subject to the disputed liens. That such was not the intention may fairly be inferred from the fact that the articles were not specified in detail as were various other properties like equipment, tools, and other chattels that were regarded as pledged fixtures. That the clause "and all other property" following the specific description relates back to the classified properties is, I think, supported by Alabama v. Montague, 117 U. S. 602, 6 S. Ct. 911, 29 L. Ed. 1000, wherein the rule of ejusdem generis was applied. See, also, In re Henningsen (C. C. A.) 297 F. 821. A similar granting clause as here was considered in Mallory v. Maryland Glass Co. (C. C.) 131

894

F. 111, and the court held that the general clause, including "all the property," must be construed to refer to the personal property appurtenant to the fixed property, and did not include or cover merchandise sold in the ordinary course of business. But counsel for the stockholders does not agree that the clauses were similar, and stresses that in this case there is contained a provision showing that the manufactured articles, etc., were intended to be included in the mortgage. With the assertion of intent I do not agree. In Smith v. McCullough, 104 U. S. 25, 26 L. Ed. 637, the Supreme Court, in defining the word "property" used in the mortgage there considered, ruled that by the use of the word "property" other property not specifically enumerated was not embraced, and that the use of the quoted word was not consistent with an intention to include the bonds. That the stock in trade, money, products finished and unfinished were not intended to be covered by the mortgage in the instant case is also reasonably inferable from the manner in which the business was carried on by the Wickwire Company, for after the mortgage it obtained various loans in large amounts at different banks, giving its accounts receivable and property inventoried as collateral security. Nor do I find anything in the phrasing of the mortgage (section 2, art. II) beginning: "Nothing herein contained shall be construed * * *" to impair the company's right to sell its product "as if it were not subject to the lien of these presents, its materials finished and unfinished products" and the like, to alter or modify what has already been said, since its intendment was to provide means for releasing certain property mortgaged, mentioned in the granting clause, and was not effective as to products finished or unfinished or inventoried items which were not subject to the lien. That there was broad and ambiguous phrasing contained in the document must be admitted; and really ambiguous phrasing in various parts relating to a manifest attempt to include assets which the parties did not intend should be covered and which were not actually covered by proper construction of the provisions.

It is a cardinal canon of construction that ambiguous or contradictory clauses in an agreement are governed by the intention of the parties, and the provisions that are free from uncertainty should be accepted and the other rejected. People v. Storms, 97 N. Y. 364. This rule of repugnancy in a mortgage, where both cannot prevail, requires that the later yield to the first. Pittsburg & Shawmut R. Co. v. Cent. Trust Co., 156 App. Div. 182, 141 N. Y. S. 66; Harper v. Hochstim (C. C. A.) 278 F. 102. In Benedict v. Ratner, supra, an assignment of present and future book accounts was made and the validity of the assignment challenged. The Supreme Court, Mr. Justice Brandeis writing the opinion, squarely held that, under the law of this state, an assignment of property to secure a debt, which reserves in the assignor the right to sell the property and keep the proceeds for his own use, is fraudulent and void. In Brown v. Leo, supra, this principle was applied to a mortgage covering both real and personal property, as already indicated. The rule, however, of section 35 of the Personal Property Law of this state (Consol. Laws, c. 41), under which I conceive the cases of Benedict v. Ratner and Brown v. Leo were decided, has been radically changed by the Uniform Fraudulent Conveyance Act of 1925, or article 10, of the Debtor and Creditor Law (Consol. Laws, c. 12), where it is provided as follows: "§ 276. Conveyance made with intent to defraud. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." And by section 270 the word "conveyance" is defined as: "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Under this act there is involved a rule of evidence and of law modifying the prior rule relating to imputable fraud, as distinguished from presumptive fraud, and it clearly puts upon the creditors the burden of proving that the conveyance or agreement was in fact actually tainted. Giving effect to this enactment, the special master found that neither the first mortgage nor the Chase prior lien mortgage was made with any fraudulent intent. The evidence, in my opinion, is insufficient to overthrow this finding and conclusion.

It is claimed in opposition that the enactment is inapplicable to this controversy on the ground that the right of the creditors, i. e., the A and B noteholders, was a vested right; and, furthermore, that the stockholders had similar rights which accrued long before the statute became effective. I do not agree with the suggested limitation, and hold that substantive rights of creditors were not

thereby abrogated. The alteration or change in the law was remedial and procedural. It did not impair contract rights. The cases relied on to support this principle find support in People ex rel., etc., v. La Fetra, 230 N. Y. 429, 130 N. E. 601, 16 A. L. R. 152; City of New York v. Appleby, 219 N. Y. 76, 113 N. E. 797; and see Report of the Proceedings of the National Conference of Commissioners on Uniform State Laws (27–28 Annual Meetings).

■ It is further suggested that the stockholders' committee should be allowed to give rebutting evidence as to the value of properties owned by the Wickwire Company and its subsidiaries in support of the defense of conspiracy and bad faith. The findings of the special master, however, in my opinion, as to alleged conspiracy and collusion, are not predicated on values, though values obviously disclosed the financial conditions and prompted various remedial steps. Nor do I think it necessary to open the case to take additional testimony challenging the appraisers' values as bearing upon the proposed plan of reorganization. The common stockholders, to all intents and purposes, were the mortgagors; that is, the first mortgage and prior lien mortgage were executed and delivered with their approval. In anticipation of confirmation of the special master's report, the stockholders' committee has interposed objections to the form of decree heretofore submitted, and proposes additional clauses affording them a measure of protection. Upon default the bondholders have clearly the right of sale of the properties mortgaged, as provided by statute, and, as said in Guaranty Trust Co. v. Mo. Pac. R. Co. (D. C.) 238 F. 812, 814, to "leave the holders of junior securities, unsecured creditors, and stockholders to protect themselves as best they can." In Guaranty Trust Co. v. Int. Steam Pump Co., supra, Judge Mayer, on the objection of the stockholders to the unfairness of a proposed plan of reorganization, in refusing compliance, said: "Courts are not empowered to make contracts for parties in interest, nor can courts adjudge or decree the terms upon which a mortgagee may allow to junior lienors, or others, participation in his mortgaged property when failure to pay the debt due him brings that property under the hammer." In a per curiam opinion, the Circuit Court of Appeals confirmed Judge Mayer's announced views, and, without modification, allowed entry of the proposed decree of foreclosure. The suggested inclusion in the foreclosure decree would, it seems to me, create confusion and might deter the sales of the properties in question.

■ I find nothing in the Columbia Law Review articles, to which my attention is directed, to convince me that common stockholders have the equitable right to challenge the fairness of a reorganization plan proposed by bondholders, unless the bondholders and stockholders are allied by agreement to effect reorganization, and this applies, I take it, to the inclusion in the foreclosure decree of the paragraph submitted, additional to what is contained at folio 170. It is doubtful whether the common stockholders in this case are in a position to question the fairness of the decree or the proposed plan of reorganization, in view of the freedom from taint of the liens. It is discretionary with the court to fix an upset price, [Guaranty Trust Co. v. Chicago, M. & St. P. R. Co. (D. C.) 15 F. (2d) 434, and Palmer v. Bankers' Trust Co. (C. C. A.) 12 F. (2d) 747], but I can see no gain or advantage in doing so in this case, for ordinarily an upset price does not imply enforcement. In any event, the price is subject to the approval of the court. To exclude from the decree any legal right to sue the officers and directors of the Wickwire Company for alleged mismanagement, by which the stockholders sustained a loss, does not impair their right to enforce any right they may have; and, for the reasons stated, the requested inclusions are tentatively denied. The foreclosure decree, however, should contain adequate provision to bar the sale in the foreclosure proceeding of the quick assets excluded from the mortgage lien, and to reserve to the general creditors the proceeds of the sale of such assets.

Finally, counsel claims that, as a result of the defense interposed by the stockholders' committee, a compensating allowance should be embodied in the decree of foreclosure on the ground that, by the efforts of its counsel, it was decided that the quick assets, amounting to $8,435,460.12, were not subject to the first mortgage lien, and that by their services they established a fund for the benefit of the unsecured creditors, noteholders, and stockholders. This application, together with application providing generally for payment of compensation expenses and liabilities contained in article 20 of the lengthy decree, as well as various other provisions, are reserved for hearing and explanation, on notice to counsel for the stockholders' committee, before the foreclosure decree is signed.

The special master's report in all respects is confirmed, but, as the answer interposed by the stockholders' committee and the ensuing hearings and arguments thereon were in good faith, neither costs nor disbursements will be imposed or taxed against said committee in this court.

On Motion by Stockholders' Committee to Include in Decree Reservation Relating to Plan of Reorganization, and on Settlement of the Decree of Foreclosure and Sale.

In the Habirshaw Case (C. C. A.) 296 F. 875, 879, 43 A. L. R. 1035, cited by counsel for the stockholders' committee, bondholders and creditors deposited their claims with the reorganization committee, and the holding of the court was that the agreement under which the claims were deposited was of binding effect, and that, on application of the creditors' committee, the claims so filed could not be withdrawn. No stockholders were involved, but the court, in speaking generally of the duty of the court in conservation actions, said that courts of equity "conserve the property in their custody until the time comes when its sale can justly be had as a step in reorganization. Sometimes such a sale takes place under foreclosure decree; other times as here, where there is no foreclosure decree."

The proposed reservation of the stockholders' committee in this case, relating to bidding and filing and publishing plans of reorganization, is a literal reproduction of a provision submitted by minority bondholders in the Guaranty Trust Co. v. Chicago, M. & St. P. Ry. Co. Case (D. C.) 15 F. (2d) 434, 436. There the plan of reorganization contained provision for the preferred and common stockholders of the old company by requiring payment of certain amounts on the respective shares of stock received in the new company; and the court held that the plan supplied protection to all stockholders and bondholders. In passing upon the application to intervene by Eisman, a stockholder, the court said that it was elementary that a stockholder had no personal or direct interest in the foreclosure suit. And "as a stockholder he has an interest in having the corporate rights asserted or protected; but, before he can be heard at all, he must be prepared to make a showing identical with that which would enable him, as a stockholder, to commence an independent suit to assert or protect a corporate right." Judge Wilkerson also said that it was not within his province "to redraw or modify or make suggestions concerning such voluntary business arrange-ments as reorganization plans," quoting from Judge Hough's decision in Conley v. Int. Pump Co. (D. C.) 237 F. 286. Although the petition for intervention alleged fraud, the court nevertheless declined to permit minority bondholders and stockholders to intervene. An appeal was taken by the minority bondholders' defense committee who objected to the plan of reorganization approved by the District Court (Jameson v. Guaranty Trust Co. of N. Y., 20 F. (2d) 808), but the Circuit Court of Appeals held that, since the minority bondholders had not been permitted to intervene, their rights having been reserved by the decree of foreclosure, they could, after the sale, assert objections to the plan. As I read the decision, the stockholders did not question the fairness of the plan on appeal, and their right, unconnected with the bondholders, was not considered.

I have been unable to find any case, though I have examined all the adjudications in Mr. Joseph's brief, wherein stockholders, unconnected with bondholders or creditors, have been permitted to question the fairness of the plan of reorganization and where, in all probability, there would be no surplus to apportion to them, and wherein defenses of fraud and connivance to bring about the sale of the properties to the injury of the stockholders were not substantiated. I have not overlooked the Steam Pump Company Case where stockholders and a committee of preferred stockholders objected to the plan of reorganization as unfair and argued to the court that they had a more equitable plan. But the court held it had not the power to make contracts for the parties in interest and could not decree the terms which the mortgagee may allow to junior lienors.

It would, therefore, be idle to let the stockholders offer a different plan from that of the bondholders, for the court would be powerless to adjust their differences.

I do not think that the consolidation of the mortgage foreclosure cases with the receivership takes from the mortgagees the right to strict foreclosure, for default in the mortgage occurred immediately on application for receivership, and the right to strict foreclosure under the laws of the state was available. Nor does it matter that the sale contemplates mortgaged and unmortgaged assets of the receivership estate, since the receivers, who represent the corporation and its stockholders, apparently have acquiesced in the joint sale.

Inasmuch as it has been decided that the stockholders have no equity in the assets

of the company, I am constrained to rule that the court cannot adjudicate the fairness of any plan of reorganization either at this time or following the sale of the properties, or consider any plan of reorganization submitted by the stockholders' committee. The request to introduce evidence challenging the finding of value as determined by the master must likewise be denied, since any such testimony might have been given at the hearing.